IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARPENTER TECHNOLOGY CORPORATION, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| vs. | : | NO. 15-1936 |
| | : | |
| RODGER WEIDA, | : | |
| Defendant | : | |

# M E M O R A N D U M

**STENGEL, C. J.**                                                                                    **January 11, 2018**

This is an action purportedly for equitable relief to enforce the terms and preserve the assets of an employee welfare benefit plan under the terms of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1000-1461. The defendant filed a motion to dismiss to which the plaintiff responded. For the following reasons, I will grant the motion in its entirety.

## I. BACKGROUND

Carpenter Technology Corporation Health & Welfare Plan is a self-funded employee welfare benefit plan. See Compl. ¶ 2. The Plan contains a provision to fulfill ERISA's requirement that such a plan be established and maintained by a written plan document. That document contains an express provision indicating that Plan participants must fully reimburse the Plan from payments received from a settlement of claims of injury/sickness caused by a third party. Id. at ¶ 11.

The complaint further alleges that it is an action for the imposition of a constructive trust and/or equitable lien over identifiable funds in the possession and/or

control of the defendant. Id. at ¶ 4. It stresses, however, that no money damages are being sought from the defendant who was a participant in the Plan. Id.

On June 9, 2013, Defendant Rodger Weida was injured in a car accident. Id. at ¶ 9. The Plan paid medical benefits on his behalf for $24,536.40. Id. at ¶ 10. Mr. Weida filed an action in Pennsylvania state court stemming from the accident. Id. at ¶ 12. He settled that action, and, according to the complaint, the settlement proceeds are allegedly within his actual or constructive possession.[1] Id. at ¶¶ 13-14. Because the defendant is allegedly in actual or constructive possession of settlement proceeds, the plaintiff insists that the defendant is therefore in possession of funds that belong to the Plan. Despite the plaintiff's requests, Mr. Weida has failed to reimburse the Plan from the proceeds of the settlement and thus has allegedly breached the terms of the Plan. Id. at ¶ 15.

Carpenter Technology seeks the following relief: (1) an Order imposing a constructive trust and/or equitable lien in favor of the Plan upon any settlement funds or any property into which they have been converted; (2) an Order enjoining the defendant from dissipating any of the settlement funds until the Plan's rights can be adjudicated; (3) an Order enjoining the defendant from transferring or disposing of the settlement funds; and (4) reasonable attorney's fees and costs. Id. at ¶ 21.

---

[1] At the Rule 16 Conference, defense counsel indicated that when the defendant received the settlement funds, he and his wife waited six months for the plaintiff "to file something" but when it did not, they placed the money in a joint fund and paid off their mortgage. Post-hearing discovery has revealed, as shown below, that this statement is not quite accurate.

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Following the Supreme Court decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), pleadings standards in federal actions have shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss under Fed. R. Civ. P.12(b)(6). Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009); see also Phillips v. County of Allegheny, 515 F. 3d 224, 230 (3d Cir. 2008).

Therefore, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The court must accept all of the complaint's well-pleaded facts as true but may disregard legal conclusions. Iqbal, 556 U.S. at 679. Second, a district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." Id. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. Id.; see also Phillips, 515 F.3d at 234-235. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short

3

and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in Twombly, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id. at 557.

## III. DISCUSSION

Under Section 502(a)(3) of ERISA, a plan fiduciary may bring a civil action in order to obtain equitable relief "to enforce . . . the terms of the plan." 29 U.S.C. § 1132(a)(3)(B)(ii). Equitable relief under Section 502(a)(3) includes the types of relief that were available in equity when the courts of law and equity were divided. Mertens v. Hewitt Assocs., 508 U.S. 248, 256 (1993). According to the Supreme Court of the United States, whether relief is equitable or legal depends upon "the basis for the [plaintiff's] claim and the nature of the underlying remedies sought." Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002) (quoting Reich v. Cont'l Cas. Co., 33 F.3d 754, 756 (7th Cir. 1994)). A plaintiff's claim has an equitable basis if an equitable lien by agreement is created, which occurs when a beneficiary agrees to reimburse an insurance plan for medical expenses out of a "specifically identified" settlement fund after the beneficiary settles with a third party. Sereboff v. Mid Atl. Med. Servs., 547 U.S. 356, 364 (2006); see also Montanile v. Bd. of Tr. of Nat'l Elevator Indus. Health Benefits

Plan, 136 S. Ct. 651, 658 (2016). A remedy is equitable if a plaintiff seeks to enforce the equitable lien by agreement against "specifically identified funds that remain in the defendant's possession or against traceable items that the defendant purchased with the funds." Id.

In his motion to dismiss, the defendant questions whether this is, in fact, an ERISA action. Instead, he argues that this case is nothing more than a breach of contract action without diversity of citizenship or a sufficient amount in controversy to reach the jurisdictional limit for claims in federal court. In addition, the defendant argues that the Plan defers to state law on the issue of subrogation, and cites the following provision in the Plan:

> Subrogation does not apply . . . when enforcing this provision is prohibited by an applicable state or federal law.

See Document #3-1 at 6. The defendant also cites the following Pennsylvania state law which prohibits subrogation in a motor vehicle accident case:

> In actions arising out of the maintenance or use of a motor vehicle, there shall be no right of subrogation or reimbursement from a claimant's tort recovery with respect to workers' compensation benefits, benefits available under Sections 1711 (relating to required benefits), 1712 (relating to availability of benefits), or 1715 (relating to availability of adequate limits) or benefits paid or payable by a program, group contract or other arrangement whether primary or excess under Section 1719 (relating to coordination of benefits).

75 Pa. C.S.A. § 1720 (known as PA's Motor Vehicle Financial Responsibility Law). Thus, the defendant argues, because the Plan itself defers to state law on the issue of

subrogation, there is no federal question involved, and the complaint should be dismissed. I disagree.

The Supreme Court of the United States explained that there are three provisions of ERISA which speak expressly to the question of pre-emption. FMC Corp. v. Holliday, 498 U.S. 52, 57 (1990). They are known as the pre-emption clause, the saving clause, and the deemer clause. Id. at 57-58. The pre-emption clause provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). However, the saving clause provides that State laws which regulate insurance, banking, or securities, are saved from pre-emption. 29 U.S.C. § 1144(b)(2)(A). Finally, the deemer clause provides that "no employee benefit plan . . . shall be deemed an insurance company . . . or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies . . . ." 29 U.S.C. § 1144(b)(2)(B).

There is no question that Pennsylvania's anti-subrogation law regulates insurance and is saved from pre-emption "unless the statute is excluded from the reach of the saving clause by virtue of the deemer clause." Holliday, 498 U.S. at 61.

> We read the deemer clause to exempt self-funded ERISA plans from state laws that "regulate insurance" within the meaning of the saving clause. By forbidding States to deem employee benefit plans "to be an insurance company or other insurer . . . or to be engaged in the business of insurance," the deemer clause relieves plans from state laws "purporting to regulate insurance." As a result, self-funded ERISA plans are exempt from state regulation insofar as that regulation "relate[s] to" the plans. State laws directed toward the plans are pre-empted because they relate to an employee benefit plan

6

> but are not "saved" because they do not regulate insurance. State laws that directly regulate insurance are "saved" but do not reach self-funded employee benefit plans because the plans may not be deemed to be insurance companies, other insurers, or engaged in the business of insurance for purposes of such state laws.

Id. The Court further held that, "if a plan is insured, a State may regulate it indirectly through regulation of its insurer and its insurer's contracts; if the plan is uninsured, the State may not regulate it." Id. at 64. Finally, the Court stated, "In view of Congress' clear intent to exempt from direct state insurance regulation ERISA employee benefit plans, we hold that ERISA pre-empts the application of § 1720 of Pennsylvania's Motor Vehicle Financial Responsibility Law" to a self-funded employee benefit plan. Id. at 65. Accordingly, I am more than satisfied that there is federal question jurisdiction here pursuant to ERISA, and hold that as a law that regulates insurance, Pennsylvania's anti-subrogation law is pre-empted by ERISA as applied to the self-funded Carpenter Technology Corporation Health & Welfare Plan. Because it is preempted, Section 1720 cannot "specifically prohibit" anything in the plan, and the plan's subrogation and reimbursement provisions are fully enforceable.

Next, the defendant relies upon the Supreme Court's decision in Knudson for the proposition that the complaint in this case seeks something other than equitable relief and is therefore subject to dismissal. Knudson, 534 U.S. at 210. In Knudson, the Supreme Court held that an ERISA plan or its administrator cannot file a lawsuit to enforce the plan subrogation provisions where the plan or its assignee seeks to impose personal liability on a participant or beneficiary for a contractual obligation to pay money. 534

7

U.S. at 221. There, the plan sought to enforce its subrogation provision under ERISA's civil enforcement provisions. Defendant Knudson was insured by an ERISA plan which had a subrogation/reimbursement provision which allowed recovery for medical expenses paid as a result of a motor vehicle accident. The plan paid medical expenses in excess of $400,000. Mr. Knudson filed suit in state court and settled. The plaintiff had no notice of the lawsuit, and sued Mr. Knudson under ERISA to enforce its reimbursement rights under the plan. It sought an injunction and Order requiring the participant to receive the settlement proceeds in order to pay the plaintiff in the amount of the expenses it had paid.

The Court held that although ERISA authorizes suits "to enjoin any act or practice which violates the terms of a plan or to obtain other appropriate equitable relief," the suit was improper. Id. at 210, 221. The Court reasoned that the insurance company was seeking the repayment of money and was not really seeking non-money or "equitable relief" permitted by ERISA. Id. at 221. According to the Court, the suit was really for money damages and suggested that if the insurance carrier or plan wanted to enforce its rights, it could have intervened in the state court personal injury lawsuit or could have sued for money damages in state court. Id. at 220.

Here, a review of the complaint reveals that the Plan is allegedly seeking the imposition of a constructive trust and/or equitable lien over identifiable funds in the possession and/or control of the defendant, and that it is not seeking money damages from the defendant's general assets. The plaintiff insists that the Plan's language designates a "specifically identifiable fund" pursuant to Sereboff, 547 U.S. 356. In Sereboff, the Supreme Court extended the Knudson analysis, and clarified the

8

circumstances under which an ERISA plan may enforce a reimbursement provision using § 502 (a)(3) of ERISA. Id. at 364. There, the ERISA plan sought reimbursement for $74,869.37 paid in medical bills from a tort settlement of $750,000. The plan filed suit to enforce its reimbursement provision. The Court held that the ERISA plan's action was authorized by § 502 (a)(3), and distinguished the situation in Knudson, noting that the plan language in Sereboff identified a specific fund against which the plan therein sought reimbursement, unlike Knudson. Id.

The Court in Sereboff further found that the terms of Mid Atlantic's plan created a lien because the plan's terms specifically identified a fund, distinct from the general assets of the Sereboffs: "All recoveries from a third party (whether by lawsuit, settlement, or otherwise) -- and a particular share of that fund to which Mid Atlantic was entitled – that portion of the total recovery which is due Mid Atlantic for benefits paid." Sereboff, 547 U.S. at 364. The Court also held that the plan in Sereboff could rely on a "familiar rule of equity" to collect for the medical bills it paid on the Sereboffs' behalf, allowing the plan to follow a portion of the recovery into the Sereboffs' hands as soon as the settlement fund was identified, and impose on that portion a constructive trust or equitable lien. Id.

Carpenter Technology points out that, here, the "specifically identifiable fund" can be found in the following language of the Plan:

> The Plan also has the right to seek payment and/or reimbursement from you if you receive a payment, settlement, judgment or award from a person, organization or insurance company in connection with an injury caused or alleged to be caused by the person or organization ...

9

> The Plan shall have a first priority lien on the proceeds of any payment, settlement or award you receive in connection with an injury caused by the person or organization ....

See Exhibit A to Motion to Dismiss at 6. Carpenter Technology insists that this language is sufficient to be deemed to have created a "specifically identifiable fund" from which it could seek reimbursement as an equitable remedy. I agree.

The basis for the Plan's claim was equitable because the Plan sought to enforce an equitable lien by agreement, a type of equitable lien created by an agreement to convey a particular fund to another party. Montanile, 136 S.Ct. at 658. The lien existed because of Mr. Weida's agreement with the Plan to convey the proceeds of any third-party settlement. Id. A claim to enforce such a lien is equitable because the Plan "could rely on a familiar rule of equity" to collect – specifically, the rule "that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing." Id. (quoting Sereboff, 547 U.S. at 363-364). The underlying remedies that the Plan sought also were equitable, because the plan "sought specifically identifiable funds that were within the possession and control" of Mr. Weida – not recovery from his "assets generally." Id. (quoting Sereboff, 547 U.S. at 362-363).

Nevertheless, at the hearing on the motion, the defendant argued that any potential lien against his settlement funds would have been long ago extinguished. He argued that the funds had been deposited into an existing checking account he jointly owns with his wife. Over the ensuing weeks, the funds were dissipated by paying for such things as food, gasoline, utility bills, credit card payments, and loan repayments from private

individuals. Into that same joint account, deposits are also made of the defendant's paychecks, his wife's pension checks, and her paychecks.

Consequently, I ordered the parties to conduct discovery limited to the issue of the dissipation of the related funds, and to submit supplemental briefs addressing the issue and its impact on the defendant's motion to dismiss.

The resultant evidence submitted shows that on July 23, 2014, defense counsel wrote a letter to plaintiff's counsel to inform her that he would be distributing the proceeds of the settlement, i.e., $46,351.81, to Mr. Weida, and that he would not be making any payment to the Plan in light of the Plan's language regarding subrogation. See Document #22-3 at 2-3. The record contains no response from the Plan. Distribution of the funds was made to Mr. Weida on August 7, 2014. Also on August 7, 2014, Mr. Weida commingled the settlement funds with other general assets by depositing the fund into a joint checking account he owned with his wife. According to the evidence presented, the entire settlement funds were dissipated six months before the plaintiff filed its complaint here.

Attached to the defendant's supplemental brief is the defendant's sworn affidavit providing details of how the settlement funds were handled and eventually dissipated:

> I deposited the proceeds from the settlement of my motor vehicle accident case into a joint account with my wife. The account had been established for years and the amount deposited was $46,351.81. This deposit was made on August 7, 2014.
>
> In addition to depositing the amount from my accident case, which was greater than the claimed subrogation lien, the account also contained a balance of $1,865.74

> just prior to the settlement deposit. The account also contained numerous deposits of my wages referred to in bank statements as "Carpenter Techno Dir Dep," and my wife's paychecks referred to as "Phoebe Ministries Payroll," and my wife's pension payments referred to as "Reading Hosp. Pens. Pmts."
>
> The funds received from settlement were used to pay my living expenses including credit card payments, gas bills, utility bills, food bills, clothing bills, etc. as set forth in the bank statements attached to my deposition. I also repaid personal loans made to my wife and me from our children and friends to help us with our finances while I was recuperating from the motor vehicle accident.
>
> Attached to my deposition is a copy of the Deed to our home which shows the real estate where I live is in joint names with my wife. The current payoff on the mortgage is approximately $120,000.00.

See Document #22-2.

At his deposition, Defendant Weida testified that some of the settlement funds were used to pay for consumer goods like groceries and gasoline which had been charged on various credit cards held either jointly or separately by the husband and wife. See Weida Dep., Document #26 at 8-9, 10, 12, 13, 19, 20. Some of the money, i.e., $5,479.96, was used to repay a loan from Mr. Weida's 401(k) retirement account which he had taken out in 2010. Id. at 10. He spent $1,103.01 for a water softener for his home. Id. at 11-12. Mr. Weida also spent $10,346.11 to repay loans to various family members who had lent him and his wife money to keep them out of foreclosure on the house during his recuperation. Id. at 16, 18, 19, 20, 23. On August 25, 2014 and September 30, 2014, Mr. Weida made two mortgage payments of $1,093.11 each from

12

the joint checking account. Id. at 17, 22. The Weidas also lent their son $1,500 from the settlement funds to assist him in moving into an apartment. Id. at 25.

I note that the joint checking account into which the settlement funds were deposited was in existence at the time of the deposit and was a joint account of Mr. and Mrs. Weida. This account had several sources of deposit not connected to the settlement funds, and coming from both the defendant and his wife. These deposits were commingled with the settlement funds and were never kept separate and apart from one another. The defendant and his wife paid all of their living expenses out of this account. In fact, by the time the plaintiff filed the complaint on April 14, 2015,[2] the settlement funds had long since been spent.

Under Pennsylvania law, "[a]n intention to create [a tenancy by the entirety] is assumed from the deposit of an asset in both the names of a husband and wife, without more, and from the fact of a marital relationship." Constitution Bank v. Olson, 620 A.2d 1146, 1149-1150 (Pa.Super. 1993). That presumption may be overcome only by clear and convincing evidence to the contrary. Id. at 1150 (the type of ownership which is created in property when a husband and wife are involved, "and in the absence of clear and convincing evidence to the contrary, is as tenants by the entireties.") Here, there is no clear and convincing evidence that any property Mr. Weida holds jointly with his wife is held in any type of ownership other than in tenancy by the entireties.

---

[2] The complaint was filed nine months after the Plan was notified of the impending distribution of the settlement funds.

"Property registered in the name of two persons who are husband and wife creates a tenancy by the entireties 'irrespective' of whether it is 'denominated a joint account or a joint tenancy.'" Id. at 1152. It is the actual marital status "and not necessarily the words stated or omitted in the instrument that determines their right to take as tenants by the entireties." Id. at 1151. Tenancy by the entireties means that "each spouse is seized … of the whole or the entirety and not of a share, moiety, or divisible part." Id. at 1150. Property, including personal property, held by the entireties is not subject to levy or execution by a creditor of one spouse only. Id. at 1147. "Entireties property may not be accessed by the creditors of only one spouse." In re Brannon, 476 F.3d 170, 173 (3d Cir. 2007). As the Third Circuit Court of Appeals has explained, this exemption from the ordinary legal process to which all other estates are subject is the chief distinguishing characteristic of an estate by the entireties. Napotnik v. Equibank and Parkvale Savings Assn, 679 F.2d 316, 319 (3d Cir. 1982). If only one spouse is a debtor, the entireties property is immune from process, petition, levy, execution, or sale. See ISN Bank v. Rajaratnam, 83 A.3d 170, 174 (Pa.Super. 2013) ("The judgment creditor has only a potential lien against property held by the entireties based on the debtor spouse's expectancy to become sole owner.")

After careful consideration, I find that when Mr. Weida's settlement proceeds were deposited into the joint checking account, it was immediately converted from a "specifically identifiable fund" to the joint property of the married couple owned by tenancy by the entireties. The "specifically identifiable fund" changed from one which the plaintiff could seek reimbursement as an equitable remedy to one immune from

process, petition, levy, execution, or sale. See Olson, 620 A.2d at 1147; see also Rajaratnam, 83 A.3d at 174. Because the settlement funds were converted into the property of both Mr. and Mrs. Weida as tenants by the entireties, they became the general assets of the couple, and outside the reach of the plaintiff. See Montanile, 136 S.Ct. at 656 (An ERISA fiduciary cannot enforce an equitable lien against a defendant's general assets). Any constructive trust or equitable lien attached to the settlement funds was extinguished. Id. at 659 (If, instead of preserving the specific fund subject to the lien, the defendant dissipated the entire fund on nontraceable items, that complete dissipation eliminated the lien. . . . At equity, a plaintiff ordinarily could not enforce any type of equitable lien if the defendant once possessed a separate, identifiable fund to which the lien attached, but then dissipated it all. The plaintiff could not attach the defendant's general assets instead because those assets were not part of the specific thing to which the lien attached). Accordingly, the equitable lien having been extinguished, any claim the plaintiff would have over the defendant is a legal one, and not available under ERISA.

Furthermore, even if the settlement funds were not converted to property owned as tenants by the entireties, the plaintiff's claim would still fail. By the time the plaintiff filed a complaint in this court, the settlement funds had been dissipated. There was no way to trace and identify whose money was used to pay what because the settlement fund could no longer be separately identified. Money from the joint account was spent on items that were the joint property of the husband and wife. For example, the money in the joint checking account was used to pay a couple of mortgage payments on the jointly owned residence. This residence has been owned by Mr. and Mrs. Weida as tenants by

15

the entireties for more than twenty years. As such, it is a general asset of the Weidas, and cannot be considered a separate, identifiable asset of the defendant alone.

There was also testimony that loans from various family members of the defendant and his wife were repaid with the settlement funds. Some of the loans were made to assist the Weidas in paying their joint mortgage during Mr. Weida's recuperation from the accident. These loans were made before the settlement funds existed and payments on the mortgage were made from the private loans, not from the settlement funds. Those funds, however, cannot be classified as an identifiable asset solely for the benefit of the defendant. The marital home was purchased twenty years before the settlement funds came into existence and is owned by the defendant and his spouse, jointly, as tenants by the entireties. The home is subject to a mortgage with a payoff balance of approximately $120,000.00. No lien can attach to the jointly owned home because the husband and wife are not jointly liable to the Plan.

Further, some of the money in the joint checking account was also used to repay a loan taken from Mr. Weida's 401(k) pension plan in 2010. The defendant repaid that loan in August 2014. The money taken out as a loan was part of that pension plan years before the settlement. Repayment of the loan did not create a separate asset of the defendant, because it had already been in existence for years before the settlement funds were ever created. The 401(k) plan is a general asset of the defendant, and was not created from the settlement funds.

Money from the joint checking account, i.e., $3,000.00, was also spent on the purchase of a motor vehicle. This payment occurred on September 29, 2014, seven and a

16

half weeks after the deposit of the settlement funds, and after those funds were spent. The joint checking account is a general asset of the defendant and his wife, and consists of monies deposited by them, not traceable to a portion of the settlement funds.

Finally, Carpenter Technology cannot trace from where the money came to pay two mortgage payments, to repay the family loans, or to repay the 401(k) loan. The joint checking account is owned by both the defendant and his wife and consists of several sources of money, not traceable to any specific deposit. The joint account consists of paychecks, pension payments, monies already in the account prior to the deposit of the settlement funds, and monies over and above the medical lien.

The plaintiff seeks equitable relief where such relief is no longer possible. Equitable remedies "are, as a general rule, directed against some specific thing; they give or enforce a right to or over some particular thing . . . rather than a right to recover a sum of money generally out of the defendant's assets." Montanile, 136 S.Ct. at 648-659. In its supplemental letter brief, Carpenter Technology argues,

> "Just putting the settlement funds into a bank account, whether it is with his wife or another, doesn't destroy the lien. To hold otherwise would allow wrongdoers to get away with avoiding liens by the simple expedient of immediately depositing the money into a joint account."

See Document #23 at 1. The Supreme Court addressed a similar argument in Montanile, and held, "Even though the defendant's conduct was wrongful, the plaintiff could not attach the defendant's general assets instead. If, instead of preserving the specific fund subject to the lien, the defendant dissipated the entire fund, that complete dissipation eliminated the lien." Montanile, 136 S.Ct. at 659. The Court continued, "where a person

17

wrongfully dispose[d] of the property of another but the property cannot be traced into any product, the other . . . cannot enforce a constructive trust or lien *upon any part of the wrongdoer's property.*" The plaintiff had "merely a personal claim against the wrongdoer" – a quintessential action at law. Id. (quoting Restatement (First) of Restitution § 215(1)). Here, by the time Carpenter Technology sought relief, it was too late. The "particular thing" no longer existed. Any claim it might now have against Mr. Weida is, therefore, a personal one against the defendant's general assets. Recovering out of those assets is a legal remedy, not an equitable one. I will grant the defendant's motion to dismiss.

**IV. CONCLUSION**

In conclusion, Carpenter Technology had an equitable lien by agreement that attached to Mr. Weida's settlement funds when he obtained title to those funds. And, the nature of its underlying remedy would have been equitable had it objected immediately upon notice or sued to enforce the lien against the settlement funds before Mr. Weida deposited the funds into the joint checking account. See Montanile, 136 S.Ct. at 658. The settlement funds subject to the medical lien were never kept as a separate, identifiable asset. They were converted to a general asset of the defendant and his wife as tenants by the entireties, and thus out of the reach of the plaintiff. Further, the factual evidence indicates that the settlement funds were entirely dissipated before the complaint was filed, and that the defendant commingled the settlement funds with his and his wife's general assets. Carpenter Technology cannot collect against the defendant's general

assets or his assets jointly owned with his wife.  The settlement funds no longer exist as a separate identifiable fund, and thus the relief requested cannot be granted.

      An appropriate Order follows.